THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* DoMINGO SALTARI CRESPO, Defendant and Appellant.

No. 7186. Argued November 14, 1938.—Decided November 30, 1938.

852

*Gaspar Encarnación Santana* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

On October 25, 1936, there was a meeting in the city of Mayagüez of the Coalition of the Union Republican and Socialist Parties. Several thousand people were gathered in front of the speakers' stand. Mr. Santiago Iglesias Pantín was speaking, and under cover of applause from the audience, Domingo Saltari, who was one of the crowd, was able to make his way to a point about 3 or 4 meters from the speakers' stand, where, drawing a revolver which he had hidden in his trousers' pocket, he fired 5 shots at Iglesias. The assailant fled, but was captured a short distance from the speakers' stand, in the very plaza in which the meeting was being held, by detectives and onlookers who-pursued him. The revolver with which he had fired the shots was seized at the same time. He was immediately taken to police headquarters and, in answer to questions put to him by the detective Juan R. Colón, he made the following voluntary statement: That he had been following him (referring to Iglesias) since some statements which he made in Washington in an effort to "derail" the Nationalist Party; that he found out that Iglesias was going to take part in the meeting and got a place near to the speakers' stand, and that while he was

talking and they were applauding, he fired at him; that he wanted to kill Iglesias and that he had killed him, the detective Colón then explaining to him that Iglesias had not been killed. (Transcript, p. 26).

A little later the Municipal Judge of Mayagüez went to the police headquarters and the defendant, after having been advised of his constitutional rights, freely and voluntarily made the following statement before that officer:

"Municipal Court of Mayagüez, P. R., United States of America, The President of the United States, SS: The People of Puerto Rico v. Domingo Saltari Crespo. Sworn statement of Domingo Saltari Crespo. In Mayagüez on the 25th day of October, 1936, before this court appears Domingo Saltari Crespo, residing at the place known as Dulces Labios, San Juan Street, in Mayagüez, and, having been duly sworn, states: I advise you that I am the Municipal Judge of this city, that you have a right to testify or not to testify and that if you do testify your statement may be used against you on the day of the trial of this case and your statement must be made voluntarily and without any offers being made to you. Under those conditions, do you wish to make a statement?

"Deponent states that he wishes to make a voluntary statement: 'That my name is Domingo Saltari Crespo, I live in the ward of Dulces Labios, San Juan Street, Mayagüez, P. R., I have lived in the same place for the last five years, and I am a cigar maker, I work in La Habanera where I have been for 8 months or a year, more or less, and I was working before in Pueblo Nuevo in the house of Francisco Rodríguez, known as "Araña," also a cigar maker; deponent is a native of Rincón and has lived in Mayagüez for the last five years. That I have been a Nationalist for the last five years, registered as such with the local Nationalist Committee in Mayagüez where my name should appear; that the deponent has been for the last 5 years and is affiliated with the cadets of the republic, a Nationalist organization; that he holds the rank of sergeant in the Rius Rivera Batallion. That affiant has no father or mother but does have a sister called Claudina Saltari, living on Echagüe Street, Playa de Mayagüez. That at dusk today the affiant, while the assembly of the Coalition of the Union Republican and Socialist Parties was being held, stationed himself close to the speakers' platform with the idea of firing some revolver shots at the Gallego, that is, at Santiago Iglesias Pantín, Resident Commissioner from Puerto Rico

in Washington; that as soon as the crowds of the Coalition Parties got to the Playa, I stationed myself in front and close to the speakers' platform with the intention and purpose of waiting until Mr. Iglesias should reach the platform and begin his speech to kill him, surely; that two orators spoke and after them García Méndez, Miguel Angel, the Speaker of the House of Representatives, and then he began to speak after having been introduced by García Méndez, and I was waiting until he should finish a part of his speech and they were applauding to kill him and that so at the moment when he finished a paragraph of his speech, I drew from my belt the revolver, Smith make, Secret Service Special brand, 38 caliber, or rather, S & W brand, automatic, No. 40830, nickel plated, black handle, almost new and pointing it toward the place where he was on the platform, I fired 5 shots, and it being my intention to kill him, I thought that I had killed him; people began to run, many of them pushed me and I fell to the pavement, I dropped the revolver, then the detective Toro came and caught hold of me and took me to the police headquarters where I made this statement. That the revolver with which I tried to kill the Resident Commissioner, Mr. Iglesias, belongs to me, I bought it in Aguadilla from someone whose name I do not remember; that I have had this weapon in my possession for 3 years.

"That it was from a handbill circulated in the city of Mayagüez by the Union Republican Party that I found out that Mr. Santiago Iglesias Pantín was in Mayagüez today and would take part in the meeting, where I stationed myself in front of the speakers' platform to kill him, as I have already stated. That my intention of killing Mr. Iglesias was exclusively mine, and mine the idea as well. That for a long time I have had and do have the idea firmly fixed of killing Mr. Iglesias ever since he said in the United States that nationalism in Puerto Rico would have to disband.

"That about 11 o'clock today I went to the ward of Algarrobo to see some friends of mine, returning about 6 in the afternoon.

"That in addition to the five bullets with which the revolver was loaded which I used to kill Mr. Iglesias, I had 6 in my coat pocket, which I put in my pocket because it was never my custom to go about with bullets for only a single loading, because I always went around with enough for two; that affiant is a voter in the Mayagüez precinct, having registered as such in 1932 and having voted in the elections in that year, affiant being without knowledge as to whether

he has been challenged as such voter or whether his name has been stricken as such from the list of voters.

''That affiant has been in the district jail in San Juan twice to visit Mr. Pedro Albizu Campos with his wife, having been able to see him only once, which affiant now rectifies and states that he was mistaken in this part of his statement, since he had never been to the jail to see him, that he was at San Juan on April 16, that he saw him and talked with him and that he has not since seen him again. That the news which affiant has had that his shots did not kill Mr. Iglesias is a matter of regret, but what is he to do. That affiant is 32 years old and lives alone in a little room on San Juan Street, in Marina Meridional of Mayagüez. That deponent has known Mr. Iglesias since 1920, that the first time he met him was in Aguadilla and later in other towns of the island; that the revolver which deponent used ·for the purposes aforesaid was not declared or registered as is required by law.

''That the foregoing is what the defendant wishes to state and declare and that his statement is in accordance with his intention and is the truth, the whole truth, and nothing but the truth, and made without mental reservation of any kind.

''That the whole of this statement having been read to deponent, the deponent rectifies the same to the extent that he now recalls that he did not speak with Mr. Pedro Albizu Campos in San Juan on April 16 and does recall that on that day he saw him speaking from a platform in San Juan, but that he ·did not talk with him, that when he left the platform deponent stood at his side. That he clarifies this because he does not want anything to appear which he does not believe is true or which is a lie and that he said it before because he did not recall the facts before. With this explanation deponent ratifies the foregoing statement in all other parts.—(Sgd.) Domingo Saltari.' Sworn to and subscribed before me this 25th day of October, 1936.—(Sgd.) Cristino R. Colón, Municipal Judge.'' (Transcript, 118–122.)

Two of the shots struck Mr. Iglesias' body. One of them scraped the skin off his right shoulder, but did not penetrate. The other lodged in the armpit on the same side, stopping very close to the humeral artery.

Saltari was accused of an attempt to kill and was tried before a jury which found him guilty of the crime with which he was charged. He then made a motion for a new trial,

which was overruled. Immediately thereafter judgment was rendered sentencing him to 10 years imprisonment in the penitentiary at hard labor. From that judgment and from the order denying him a new trial, defendant has taken the present appeal.

In praying for a reversal of the judgment, counsel for the defendant assigns to the trial court the commission of 32 errors. We have examined them all, and, omitting repetitions, they can be reduced to 19, to wit:

1. In allowing the word "Honorable," abbreviated, to precede the name of the injured person, Santiago Iglesias Pantín, in the information filed in this case.

2. In not admitting evidence as to the number of shots other than those fired by the defendant which the witnesses might have heard.

3. In not permitting the witness San Antonio to be asked on cross-examination whether there was a general panic in the crowd as a result of defendant's shots.

4. In admitting the testimony of the detective Juan R. Colón as to the defendant's confession, as the district attorney had in his possession the sworn statement of defendant made before the Municipal Judge of Mayagüez.

5. In not permitting the witnesses for the prosecution to be questioned on cross-examination as to what the speaker was saying at the time he was assailed by defendant.

6. In admitting in evidence the bullets and a plank from the speakers' stand showing the bullet holes.

7. In admitting the negative of the X-ray photograph of the wounds taken by the physicians who attended Mr. Iglesias, and in permitting the district attorney to prefix the name of the injured person, Santiago Iglesias, with the title "Honorable" when offering this evidence.

8. In not accepting the excuse of the attorney for the defendant, Mr. Pinto Gandía, when he arrived late in court after a recess and in demanding that he show by the statement

of a doctor that his lateness was due, as he stated, to illness and not from a wish to delay the proceedings or to interrupt the work of the court.

9. In interfering on several occasions with the interrogation of witnesses, by questions from the court.

10. In not permitting the defendant and witnesses for the defendant to testify on direct examination as to the words used by Santiago Iglesias at the moment of the shots.

11. In usurping the functions of the district attorney to the extent that the judge on his own motion characterized certain questions of the defense, on direct examination of the defendant, as leading and later on in the examination of the same witness ordered an answer to be stricken out, without there having been any objection thereto or motion therefor from the district attorney.

12. In preventing, without objection from the district attorney, the witness Enrique Nieves Román from testifying as to what Iglesias was saying on the platform, and of its own motion, ordering what the witness had succeeded in saying on that point to be stricken out.

13. In striking out the words of the same witnesses imputing to Mr. Iglesias the words: "The day that Puerto Rico becomes a republic it will be a country of ruffians," which was stricken out on motion of the district attorney but without the latter having set forth the grounds for such motion.

14. In not permitting a general exception at the conclusion of the testimony of the same witness, the court having said: "The court does not permit a general exception, because an exception has been taken every time anything has been decided," thus showing, according to the defendant, "prejudice, passion, and partiality."

15. In characterizing as a mere conclusion and in striking out the answer of the witness Felipe Peña (Transcript, pp. 143–145), as follows: "The words which he spoke were directly insulting to Saltari," thus showing, according to the

defendant, "great prejudice, passion, and manifest partiality, a usurpation of the office of district attorney."

16. In permitting the district attorney on his re-direct examination to call the defendant "murderer."

17. In refusing to give specific instructions on "aggravated assault and battery" and "assault with intent to kill," and in not permitting argument on the exception to the refusal to give such instructions.

18. In overruling the motion for new trial and in sentencing the defendant to 10 years imprisonment in the penitentiary.

19. In that the trial judge was without power to act as such, his appointment by the Governor of Puerto Rico being void.

We shall consider first the errors numbered 1, 2, 3, 4, 6, 7, and 8.

■ (1) Prefixing the name of the injured party, Santiago Iglesias Pantín, with the title of "Honorable" in the information filed by the prosecuting attorney could in no way have prejudiced the defendant's interests, much less in a country such as this where that title is so freely used. Furthermore, the injured party is head of one of the principal political parties of the Island and has for several years occupied the office of Resident Commissioner of Puerto Rico in Washington, and is for those reasons so well known in this Island that it will be difficult to find anyone who knows how to read and write who is not acquainted with Santiago Iglesias either personally or through the press. The upshot is that giving him the title of "Honorable" could neither detract from nor add anything to his identity, although we do not recommend the practice of using honorary or any other kind of titles in judicial documents.

■ (2) A determination of the number of, or even any reference to, any other shots which, in addition to those fired from defendant's revolver, the witnesses might have heard,

is completely impertinent and immaterial, particularly where as in this case the defendant does not deny that it was he who inflicted the wounds suffered by Mr. Iglesias.

■ (3) Inasmuch as this case does not involve a complaint for disturbance of the peace, what could be the relevance of testimony as to whether defendant's shots did or did not cause a general panic in the crowd?

■ (4) The defendant confessed at two different times: First, orally before the detective Juan R. Colón in the police headquarters prior to the arrival of the municipal judge; later, also in the police headquarters, in making a written statement before the municipal judge. In these circumstances, the written statement before the municipal judge does not exclude the prior oral confession before the detective, for the latter, in testifying, did not recount what the witness stated in writing, but related what he had therefore said in the police headquarters.

■ (6) As a matter of fact, we do not see the materiality of presenting the plank from the speakers' stand showing the bullet holes. The district attorney said that it was his purpose to show the position from which the shots were fired, but in this case the defendant himself admits that he caused the wounds, although contending that it was in self-defense. The direction from which the shot came is therefore immaterial, and although the admission of such evidence was erroneous, it could not have caused any prejudice to the defendant.

■ (7) The negative of the X-ray photograph was clearly admissible and was sufficiently identified by Dr. Nelson Perea, who took it, and it could also be delivered to the jury upon retiring for deliberation, in accordance with section 274 of the Code of Criminal Procedure (1935 ed.), which provides:

"Section 274.—Upon retiring for deliberation the jury may take with them, all papers (except depositions) which have been received

as evidence in the cause, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession. They may also take with them the written instructions, if any are given.''

█ (8) The fact that the court required the attorney to prove by the statement of a doctor that he did not appear on time at the session of the court because he was ill, has no connection whatever with the guilt or innocence of the defendant. The question was one wholly between the attorney and the court. On other occasions during the same trial counsel for the defendant arrived after the hour set for the beginning of the session, and the court had to recess until his arrival. (Transcript, pp. 2, 4.)

The judge of the lower court was warranted in demanding a showing that counsel's purpose was not to interrupt or delay the proceedings.

The assignments numbered 1, 2, 3, 4, 7, and 8 are not well-taken, and as to the sixth, the error, as we have seen, was harmless.

We shall now consider the assignments numbered 5, 9, 10, 11, 12, 13, 14, 15, 16, and 19.

█ (5) Appellant complains that he was not permitted to cross-examine the witnesses for the prosecution about what Mr. Iglesias was saying at the time of the shots. Let us see what the record shows.

The witness Juan J. San Antonio, the first witness for the prosecution, was subjected by the defense to the following cross-examination:

''Q. Did you say that Mr. Iglesias was speaking at that time?— A. Yes, sir.—Q. Do you remember what Mr. Iglesias was saying at that time?—A. Mr. Iglesias was commenting on the attitude, was criticizing the attitude of a group of clowns who while the coalitionist parade was passing had jeered and thrown orange pulps at them.— Q. In saying clowns, do you refer to the students? . . .—A. I meant by that a group of people, of individuals who had taken it upon themselves to jeer and throw orange pulps and to make a scene

in front of the Exchange, and it was for that reason I called them clowns.—Q. Do you remember some of the statements which he made?—A. He was censuring their actions, was saying that it had been an improper act upon the part of that group of individuals to have done what they were doing.—Q. Do you remember whether he said that they were lawless?—A. Yes, sir.—Q. . Do you remember whether he said that they were clowns?—A. No, sir, he didn't say that.—Q. These words which Mr. Iglesias used, were they strong words?—Judge: He has already repeated the words.—District Attorney: I object to further cross-examination upon this point.— Judge: Ask the witness what Mr. Iglesias' attitude was. Whether they were strong would be a conclusion of the witness. Whether they were strong or not the gentlemen of the jury will decide.— District Attorney: I object to bringing in Mr. Iglesias' attitude.— Judge: The court is going to permit the question.—Q. What was Mr. Iglesias' attitude that night?—A. What do you mean?—Q. His attitude toward those clowns?—A. Peaceful.—Q. How long had Mr. Iglesias been speaking when the events occurred?—A. About ten or fifteen minutes." (Transcript, pp. 10, 11, 12.)

From the above quotation it appears that the defendant was permitted amply to cross-examine the witness as to what Mr. Iglesias was saying at the time of the shots. Furthermore, it appears from the defendant's cross-examination that Mr. Iglesias did not in any way refer to the defendant or use any phrase which might have produced a sudden attack of rage, since it is to be presumed that if such statements had been made, the defense would at least have questioned the witness and not have restricted the examination to an investigation of what Mr. Iglesias was saying about those individuals who had tried to annoy or interrupt the earlier parade to the meeting.

The witness Juan R. Colón, the second witness for the prosecution, testified on direct examination as to what happened in the meeting while Mr. Iglesias was speaking. The defense put the following questions to him:

"Q. You say that when these things happened Mr. Iglesias was speaking?—A. Yes, sir.—Q. Mr. Iglesias was speaking?—A. Yes, sir.—Q. Do you recall what statements he was making when these

things happened?—District Attorney: I object to that as irrelevant. —Defense: In support of that question, let me point out that the district attorney brought out the fact that Mr. Iglesias was speaking there, on his direct examination.—Judge: In any event the question of the district attorney was limited to the fact that he was talking. The court will not permit the question.—Defense: The defense takes an exception for the following reasons: That the witness having stated that at the time of the events Mr. Iglesias was talking and that he was present, the defense desires to investigate what Mr. Iglesias was saying at the time the events happened, as to which the defense believes that Mr. Colón can testify." (Transcript, pp. 30, 31.)

Counsel for the defendant did not insist upon further direct questions for the purpose of getting the witness to testify as to the words used by Mr. Iglesias, if he used any, which might have produced a fit of rage in the defendant. We have already seen the questions which freely and without any hindrance were put to the prior witness San Antonio, none of which suggested even slightly that Mr. Iglesias had made any statement offensive to the defendant. Furthermore, the district attorney at no point during the direct examination sought to show what Santiago Iglesias was saying. The witnesses said only that the shots occurred at the time he was speaking. The shots might just as well have been fired while Mr. Iglesias was getting into an automobile, and in that case the make of the automobile, its price, etc., would not have been matter for cross-examination.

An incident similar to that which arose during the testimony of Mr. Colón, occurred during the testimony of the witnesses for the prosecution, Andrés A. Vélez (Transcript, p. 59), Ricardo Seguinot (Id., p. 66), Gilberto E. Rodríguez (Id., p. 97), and Juan Bernard González (Id., p. 103).

Let us see now what the defendant himself, on direct examination by his own counsel, testified as to what Mr. Iglesias was saying at the moment of the shots:

"Q. Tell the gentlemen of the jury the words which you heard Mr. Iglesias use.—District Attorney: Very general.—Defense: That

referred to the defendant.—A. In accordance with our political sentiments which lie within our hearts. . .—Q. State the words that you heard. . .—A. I cannot answer you.—Q. Tell me, what words did you hear Mr. Iglesias use addressed to you which you believed were against you personally.—A. He said that there were a bunch of clowns there.—Q. What more did he say?—A. After that that the students of Mayagüez were a pack of ruffians, of clowns, that that was now that they were under the control. . . that when this was a free country it would be a republic of loafers and of scoundrels and of robbers.—Q. He didn't say criminals?—Judge: That is leading.—Q. What more did he say.—A. That they were outlaws.'' (Transcript, pp. 128, 129.)

This is all that the defendant said in answer to questions from his own counsel with respect to what Mr. Iglesias was saying against him at the time he fired the shots. If there was any error on the part of the court in not permitting the other witnesses for the prosecution to be cross-examined upon this point, it necessarily follows that this error could not have been harmful to defendant's interests, for we must presume that those witnesses would at most have given the same testimony as the defendant, who is the party really interested in showing the gravity of Mr. Iglesias' supposed provocation and insults.

(9) The judge was entitled to examine the witnesses for the purpose of clarifying any obscure point in their testimony, thus preventing the jury from receiving an erroneous impression of the evidence. *People* v. *León, ante,* p. 408. The questions asked by the judge in this case, as shown by the record, were of such a nature as not to have been in any way prejudicial to the defendant.

(10) We have already seen what legal grounds the judge of the lower court had in preventing cross-examination upon matter not covered by the direct examination, and in this he acted correctly.

(11 and 12) When objection has been made several times to a question and the objection has been sustained, the

judge may, of his own motion, prevent a repetition of the question, thus insuring respect for his ruling and preventing by these means an unnecessary delay of the trial.

■ (13) Defendant complains that the district attorney moved to strike out a certain answer of a witness without setting forth the grounds for his motion and that the judge, notwithstanding the lack of argument on the part of the prosecutor, granted the motion. It is not indispensable that every objection or motion made during a trial, whether in opposition to the admission of evidence or to strike out any answer of a witness, be argued by the moving party. If the judge is convinced that the prosecution or the defense, as the case may be, is correct in moving to strike out an answer or in objecting to a question, it is not necessary for him to. waste time by requiring argument to convince him of what he is already convinced. The purpose of argument in such cases is simply to convince the judge, and if he is already convinced argument is unnecessary.

■ (14) If a party makes objection to different questions put to a witness and takes exception to the rulings of the court overruling his objections, it is not proper for the party so objecting to note a general exception to such testimony at the conclusion of the examination of the witness. The judge need not state that he does not allow such a general exception, but if he does so, it does not show passion, prejudice, or partiality as the defendant contends.

■ (15) The statement: *"The words which he spoke were directly insulting to Saltari,"* made by a witness without stating what the words were which he so characterized, is a mere expression of opinion. Another witness might have been of the contrary opinion and have believed that the words characterized by the first as insulting were completely inoffensive. The trial judge was correct in characterizing the statement as a mere expression of opinion of the witness and in ordering them stricken, and his action in so doing

does not, as defendant contends, imply "great prejudice, passion, and manifest partiality."

■ (16) It does not appear from the record that the district attorney on his re-direct examination called the defendant a "murderer." If in fact he did so, the defendant should have objected at that time and have caused the words of the district attorney to appear in the record, together with his objection, the ruling of the court, and the instruction which the judge gave, if any, that the word be not taken into consideration, and also a statement of the failure to give such instruction if none was given. Since nothing appears in the record to support this assignment of error, it is our duty not to consider it.

■ (19) From the certified copy of the appointment of the judge sitting in this case, offered by the defendant, it appears that he was a special judge appointed to substitute for the regular judge during a leave of absence of 20 days granted to the latter. The special judge did not act in substitution for the regular judge in a case in which the latter was disqualified. His appointment was, therefore, perfectly lawful, and the principles laid down in the case of *Annoni* v. *Nadal*, 94 F. (2d) 513, are inapplicable. See *Balbaño* v. *Cintrón, ante,* p. 701.

We shall now give consideration to the remaining assignments.

■ (17) The crime of attempt to kill or assault with intent to commit murder, as defined in section 218 of the Penal Code (1937 ed.), consists of an assault under such circumstances that if the victim had died within a year and a day after the attack as a result of the assault, the crime committed by the defendant could have been characterized as murder. In other words, it is a frustrated murder in which death does not occur by reason of circumstances outside of defendant's control. In this case the defendant's two confessions, one before the detective Colón and the later one be-

fore the municipal judge, above quoted, contain more than a requisite showing that the defendant deliberately and with malice aforethought, intended to take away the life of Santiago Iglesias, and that for the purpose of carrying out his intention, he fired five shots at him, under such circumstances that in all probability he would not only have killed his victim, but would also have killed other persons standing at his side at that time. If Mr. Iglesias had died as a result of his wounds within the statutory period, defendant's crime would undoubtedly have been first degree murder. Since Mr. Iglesias did not die, the crime was reduced to an assault with intent to commit murder, also called an attempt to kill. (Penal Code, sec. 218.)

Defendant requested special instructions with respect to the crimes of assault with intent to kill and aggravated assault and battery, which the court refused to give.

To reduce the crime of murder to manslaughter, the provocation must be such as to make an ordinary man lose control of himself and, impelled by such provocation, act on the spur of the moment, without due reflection and without deliberate intent. 1 Wharton's Criminal Law (12th ed.) 648 and 655. See also the annotations in 21 A.L.R. 603, 612; 27 A.L.R. 1097; and 102 A.L.R. 1019.

We have already seen that the alleged provocation was not addressed to the defendant. Mr. Iglesias' censure of those individuals who failed in their duty as citizens in offending the paraders, would have been incapable of arousing even in the persons to whom he was referring, the heat of passion which would have justified a reduction of the crime from murder to voluntary manslaughter. What ground, therefore, did the trial judge have for giving the instructions requested by defendant with respect to assault with intent to kill and aggravated assault and battery? To justify a trial judge in giving instructions with respect to lesser crimes necessarily included within the crime charged in the infor-

mation, it is necessary that there be some evidence from which the jury may reasonably infer that the defendant is guilty of the lesser crime. The power conferred upon the jury by law may not be capriciously or arbitrarily exercised. A verdict reducing the degree of the crime must be based upon evidence tending to show or sufficient to raise a reasonable doubt as to the existence of the lesser crime, and if such evidence does not exist, neither may the judge give instructions with respect to the lesser crime, nor may the jury bring in a verdict reducing the degree of the crime charged in the information. *Wilson* v. *State,* 129 S. W. 613 and the annotations above cited. See also, for example, the cases of *People* v. *Rodríguez,* 35 P.R.R. 395, and *People* v. *Fernández,* 49 P.R.R. 571, in which the defendants were accused of murder and where this court thought that the evidence warranted instructions with respect to voluntary manslaughter.

 Defendant complains that the judge did not permit him to argue the exceptions taken to the instructions of the court to the jury. No such incident appears from the record, but assuming that it did take place, it would not even so be ground for reversal, because although it has been decided in this jurisdiction, following the general rule laid down on the continent, that exceptions to the instructions of the court must be taken before the jury withdraws to deliberate (*People* v. *Maldonado,* 45 P.R.R. 405), this does not imply that the defendant is entitled to argue the exceptions taken to the instructions of the court in the presence of the jury. Exceptions to the instructions of the court are questions of law which are addressed exclusively to the judge and which should not reach the ears of the jurors. For this reason we recommend as the better practice that which has been followed in the District Court of the United States for Puerto Rico. Under this practice defendant's counsel dictates to the stenographer his exceptions to the instructions and his legal grounds therefor in a voice so low as to be inaudible to the

jury, or the jury withdraws while the exceptions are taken and argued, returning later for final submission of the case, at which time the instructions already given are corrected and amplified, if the court believes that they were erroneous or inadequate, or left standing without any change if the court believes them sufficient. Since we have examined the instructions and have found them correct, defendant in this case suffered no prejudice by being deprived of an opportunity to set forth the grounds for his exceptions.

 (18) The maximum penalty for the crime of attempt to kill is imprisonment in the penitentiary for fifteen years. Consequently, a sentence of ten years' imprisonment in the penitentiary is within the powers conferred upon the trial judge by law, and considering the circumstances of this case, we see no reason to interfere with his discretion in imposing such a sentence. *The People* v. *Agosto,* 14 P.R.R. 601.

For the reasons stated, and having reached the conclusion that there was in this cause no error prejudicial to the defendant's interests, we affirm the judgment appealed from as well as the order denying a new trial.

Mr. Chief Justice Del Toro took no part in the decision of this case.